United States District Court
Southern District of Texas

**ENTERED**
January 04, 2019
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT　　　　　　　SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| Miguel Angel Navarro,<br>　　Petitioner, | §<br>§<br>§ | |
| v. | §<br>§<br>§ | Civil Actions H-15-352<br>and H-15-353[1] |
| Lorie Davis,<br>Director, Texas Department of<br>Criminal Justice, Correctional<br>Institutions Division,<br>　　Respondent. | §<br>§<br>§<br>§<br>§ | |

## Memorandum and Recommendation

Miguel Angel Navarro is serving ninety-nine years in prison for murder and twenty years for aggravated assault, concurrently. Navarro filed a petition for writ of habeas corpus under 28 U.S.C. § 2254. (D.E. 1.) Lorie Davis has moved for summary judgment. (D.E. 15.) The court recommends that Davis's motion for summary judgment be granted and Navarro's petition be denied with prejudice. *See* 28 U.S.C. § 2254(d).

1. Background and Procedural Posture

　　A. Factual Background

On December 26, 2007, Matthew Haltom hosted a "bonfire" party in the yard of his parents' house. Witness testimony about what happened at the party varied, but there is no dispute that a group of people arrived at the party whom Matthew Haltom asked to leave. A confrontation developed between Haltom's group of friends and the group that was told to leave. There was yelling, a bottle was thrown, and a melee broke out in the yard and the street in front of the Haltom residence. By the time police arrived, three people had been stabbed: Matthew

---

[1] These cases have been consolidated. H-15-352 is the lead case. All references to docket entries ("D.E.") are to documents filed in H-15-352.

Haltom, Joseph Eodice, and Joel Arnold. Matthew Haltom died from his stab wounds. Eodice and Arnold, invited guests of the Haltoms, recovered. Navarro, a member of the group that Haltom asked to leave, admitted to his friends and told police that he had stabbed at least two people.

### B. Charges and Trial

Navarro was charged with murder and two counts of aggravated assault in 2012. The County Court at Law No. 2 of Fort Bend County, Texas, sitting as a juvenile court, waived its jurisdiction and transferred the charges to the 240th Judicial District Court for Fort Bend County, where Navarro was prosecuted as an adult. Navarro moved to suppress oral statements he made to police officers that he stabbed multiple people at the party. (D.E. 10-20 at 21:20–25.) The court granted Navarro's motion to suppress his statements, but noted that his statements could be used to impeach him. (D.E. 10-20 at 55:10–56:18.)

The case was tried to a jury. Navarro was represented by Maggie Jaramillo and Eduardo Franco. They based their trial strategy on self-defense. For example, they (1) questioned prospective jurors about incidents in which they felt justified using force to protect themselves in a fight (D.E. 12-2 at 95:13–104:6), and about "hold[ing] the State to their burden of having to disprove self-defense [] beyond a reasonable doubt" (D.E. 12-2 at 104:8–107:15); (2) stated in opening that Haltom and his friends "viciously attacked" Navarro and his friends, requiring defense of self and others (D.E. 12-3 at 25:19–23); and (3) elicited testimony about who incited the fight, the number of people involved on each "side," the weapons present, and the force used. Central to the defense strategy at trial—and to Navarro's habeas corpus petition—is the theory that Navarro's brother, Guadalupe Salazar, was under attack by multiple members of Haltom's group, justifying Navarro's use of deadly force against Haltom and Eodice to protect his brother. (*See, e.g.,* D.E. 12-15 at 31:3–36:11 (closing argument).)

According to Jaramillo's affidavit, produced in Navarro's state habeas proceedings, during an off-the-record charge conference, Jaramillo requested a "multiple assailants" jury instruction as to all charges, which the judge denied. (D.E. 13-21 at 48–49.) The multiple assailants charge elaborates on the self-defense instruction to the effect that, when an attack is being conducted by two or more people acting in concert, the person attacked is justified in using force against any

2

member of the group, even if the recipient of that force is not engaging in conduct that would, by itself, justify the use of force.

On the record before closing argument, the court asked counsel for the State and the defense whether they had any objection to the charge. Jaramillo said, "No, Your Honor." (D.E. 12-15 at 9:15–25.) During closing argument, Jaramillo argued that Navarro could have reasonably believed he needed to defend himself and his brother, Salazar, with deadly force, and concluded:

> I'm asking you to consider that he was justified, I'm asking you to come back and say that he was justified [] in defending himself and protecting his brother. He was 15 at the time, his brother was 17, and it was a difficult decision to make. But I'm asking you, and you promised me before that you would follow the law, and the law says he has those defenses. And I'm asking you to follow that law. And I'm asking you to send him home. I'm asking you to send him home and come back with a verdict of not guilty.

(D.E. 12-15 at 42:18–43:4.)

The court instructed the jury on self-defense and defense of others with respect to all three charges. The jury charge included the following instructions on the law of self-defense and defense of others, but did not include the multiple assailants theory of self-defense:

> [E]xcept when the use of force against another is not justified as set forth below, a person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other person's use or attempted use of unlawful force.
> The use of force against another is not justified: (1) in response to verbal provocation alone; (2) if the actor consented to the exact force used or attempted by the other; (3) if the actor provoked the other's use or attempted use of unlawful force, unless the actor abandons the encounter, or clearly communicates to the other his intent to do so reasonably believing he cannot safely abandon the encounter, and the other nevertheless continues or attempts to use unlawful force against the actor; or (4) if the actor sought an explanation from or discussion with the other person concerning the

>   actor's differences with the other person while the actor was unlawfully carrying a weapon or possessing or transporting an illegal weapon.
>   A person is justified in using deadly force against another if the actor would be justified in using force against the other in the first place, as set forth above, and when and to the degree the actor reasonably believes the deadly force is immediately necessary to protect the actor against the other person's use or attempted use of unlawful deadly force, or to prevent the other person's imminent commission of murder. . . .
>   [A] person is justified in using force or deadly force against another to protect a third person if, under the circumstances as the actor reasonably believes them to be, the actor would be justified as described in the preceding section in using force or deadly force to protect himself against the unlawful force or deadly force he reasonably believes to be threatening the third person he seeks to protect, and the actor reasonably believes that his intervention is immediately necessary to protect the third person.

(D.E. 10-9 at 93–96.) The jury charge on aggravated assault included very similar instructions on self-defense and defense of others. (D.E. 10-12 at 107–11.) The jury found Navarro guilty of murder and one count of aggravated assault, and assessed Navarro's sentence at ninety-nine years in prison for murder and twenty years for aggravated assault. Navarro is eligible for parole in 2037.

C. Appeal and Collateral Attack

Navarro's conviction was affirmed on direct appeal on August 30, 2012 (D.E. 10-16), and his petition for discretionary review in the Court of Criminal Appeals was refused on April 17, 2013. (D.E. 10-4.) Navarro sought state habeas corpus relief, raising the claims brought in this federal habeas corpus petition and others not raised here. (D.E. 13-21.) The state trial court denied his application without issuing written findings of fact or conclusions of law. The Texas Court of Criminal Appeals denied the application without issuing a written order.

Navarro filed his federal habeas corpus petition, claiming ineffective assistance of trial counsel for failing to request on the record the multiple assailants instruction and for failing to object to its exclusion from the final jury instruction on

the record. Navarro asserts that this deficiency prejudiced him because the jury charge improperly "limited the jury to considering *only* the actions of the victims themselves," and that considering the actions of all of Haltom's invited guests may have led the jury to acquit Navarro. (D.E. 37 at 19–20.) Navarro also argues that his trial counsel's failure to request or object to the lack of the multiple assailants charge on the record precluded meaningful appellate review. (D.E. 37 at 24.)

2. Standard of Review for § 2254 Cases

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), a federal court cannot grant habeas relief "with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim ... resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by" the Supreme Court, or "a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

When, as here, there is no reasoned state-court decision on the merits, the federal court "must determine what arguments or theories ... could have supported the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Sexton v. Beaudreaux*, 138 S. Ct. 2555, 2558 (2018); *Mejia v. Davis*, 906 F.3d 307, 314 (5th Cir. 2018). If such disagreement is possible, then the petitioner's claim must be denied. *Id.* The Supreme Court has often emphasized that "this standard is difficult to meet" "because it was meant to be." *Id.*; *Mejia*, 906 F.3d at 314.

3. Navarro's Jury Instruction Claim

Navarro claims that he was denied effective assistance of trial counsel because his lawyer did not request on the record an instruction on the law of self-defense against multiple assailants, and did not object to the instruction's omission from the final jury charge.

The multiple assailants instruction provides that a person is justified in using deadly force against another when and to the degree he reasonably believes the force is immediately necessary to protect himself against use or attempted use of unlawful deadly force by the other, *or any member of a group conducting an attack*

*as a group*, if a reasonable person in the actor's situation would not have retreated. Tex. Penal Code, §§ 9.31, 9.32; *Jordan v. State*, No. 06-17-00161-CR, 2018 WL 2639246 (Tex. App.—Texarkana, 2018). In an often-cited concurring opinion, Judge Keller of the Texas Court of Criminal Appeals has elaborated:

> The theory behind the multiple assailants charge is that, when it is clear that an attack is being conducted *by multiple people as a group*, a defendant is justified in using force against any member of the group, even if the recipient of that force is not engaging in conduct that would, by itself, justify the use of force (or deadly force as the case may be) . . . . The rule concerning multiple assailants is essentially an application of the law of parties to the defendant's assailants.

*Dicky v. State*, 22 S.W.3d 490, 493 (Tex. Crim. App. 1999) (Keller, J., concurring) (emphasis added).

    To prevail on a claim of constitutionally ineffective assistance of counsel, a petitioner must show (1) "counsel's performance was deficient" and (2) "the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010); *Mejia*, 906 F.3d at 315. It is "all the more difficult" where, as here, a defendant challenges a merits denial of his *Strickland* claim under AEDPA. *Harrington*, 562 U.S. at 105; *Mejia*, 906 F.3d at 315. "The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Id.*; *Mejia*, 906 F.3d at 315 (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)). Because *Strickland* is a general standard, "a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Knowles*, 556 U.S. at 123; *Mejia*, 906 F.3d at 315; *see also Harrington*, 562 U.S. at 105 ("The *Strickland* standard is a general one, so the range of reasonable applications is substantial."). It is well settled that a state court's "*unreasonable* application of [*Strickland*]"—which AEDPA demands—"is different from an *incorrect* application of [*Strickland*]." *Id.* at 101 (quoting *Terry Williams v. Taylor*, 529 U.S. 362, 410 (2000)) (emphasis in original); *Mejia*, 906 F.3d at 315.

6

A. Deficient Performance

Navarro asserts that "trial counsel argued for the inclusion of a charge on defense against multiple assailants, but failed to object when it was omitted." (D.E. 1 at 6.) He argues this was deficient because "the evidence at trial indisputably supported a multiple assailants instruction," yet trial counsel "never even specifically requested a multiple assailants instruction on the record" and failed to object. (D.E. 37 at 20, 8, 9.)

Deficient performance means that "counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688–89. In reviewing counsel's performance, however, courts must be "highly deferential," eliminate the "distorting effect of hindsight," and "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.

"Defense counsel's strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengable." *Mejia v. Davis*, 906 F.3d 307, 316 (5th Cir. 2018) (internal citations and quotations omitted). "A court reviewing those choices is required not simply to give counsel the benefit of the doubt, but to affirmatively entertain the range of possible reasons he may have had for proceeding as he did." *Id.* (internal citations and quotations omitted). The Fifth Circuit has "explained that counsel is afforded particular leeway where a potential strategy carries 'double-edged' consequences." *Id.* (internal citations and quotations omitted). "Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge." *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (cited in *Mejia*, 906 F.3d at 317). It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence." *Harrington*, 562 U.S. at 105 (quoting *Strickland*, 466 U.S. at 690).

With no reasoned state-court decision on the merits, this court "must determine what arguments or theories . . . could have supported the state court's decision;" and "whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with" Supreme Court precedent. *Sexton*, 138 S. Ct. at 2558. The court finds that the state habeas court reasonably could have determined that Navarro's trial counsel was not deficient.

First, counsel *did* request the instruction. Counsel decided not to pursue it on the record as part of a strategic decision, discussed below.

In Navarro's state habeas proceedings, Jaramillo submitted an affidavit stating that:

> A charge conference was held in the jury assembly room with the Judge, the State and Defense counsel present. . . . I proposed self defense, defense of others, and self defense against multiple assailants. Once the Court agreed with the defense counsel that he believed self defense and defense of others were applicable in the case, *without the need of having the Defendant testify*, I agreed to the language in the charge containing the language of self defense and defense of others and abandoned the pursuit regarding multiple assailants. . . . It was my objective to obtains [sic] a self defense and defense of others charge and not be precluded from such defense with the State arguing that the defendant and his group created the difficultly [sic]. It was my objective to obtain the charges *without the defendant having to testify*. Once the court granted two out of the three jury charges requested, I did not pursue the multiple assailant language in the self-defense and defense of third person charges. It was my trial strategy to ask for more jury charges than what the facts supported predicting the court would grant the jury charges as it did as a compromise to both sides.

(D.E. 13-21 at 48 (emphasis added).) Eduardo Franco submitted a similar affidavit. (D.E. 13-21 at 51–53). The state habeas court could reasonably have credited these two affidavits.

As for failing to object on the record, the court's independent review of the record indicates that the state habeas court reasonably could have determined that Jaramillo made a valid strategic choice not to do so. She was in a difficult position at the close of evidence. She had decided not to put her client on the stand. Navarro does not challenge the wisdom of keeping him off the witness stand. Moreover, his suppressed statements to the police could have been used to impeach him.

Jaramillo was concerned that without her client's testimony, the court might not instruct the jury on self-defense at all. During the charge conference, she asked for, and received, the self-defense and defense of others instructions. Jaramillo's

8

affidavit indicates that she was concerned further argument on the multiple assailants instruction could trigger the State to argue that Navarro was not entitled to any self-defense instruction at all. She therefore abandoned the multiple assailants argument, which was a sensible strategy.

Jaramillo's concern about not being entitled to a self-defense instruction was legitimate. The record contains very little, if any, evidence regarding Haltom's or Eodice's actions during the fight—a fact Navarro highlights in his response to Davis's motion for summary judgment. (D.E. 37 at 24–25.) There is very little evidence that Haltom or Eodice were acting in concert with anyone exerting unlawful force against Salazar, much less that anyone arguably acting in concert with Haltom or Eodice was wielding deadly force.

For example, Mackenzie Haltom testified that she did not know who was actually fighting as opposed to merely present at the scene. (D.E. 12-4 at 28:2–3.) Jeremy Cano testified that Navarro told him he stabbed people who were hitting him, but did not identify who was involved. (D.E. 12-6 at 149:9–22.) Several witnesses testified that they did not know where Matthew Haltom was or what his involvement was in the fight. Among them, Mallory Tharpe testified that she saw Matthew Haltom leave the brawl to get a golf club, but did not see him swing it at anyone and did not see him again until he was on the ground after being stabbed. (D.E. 12-4 at 96:15–23.) Even Salazar, Navarro's brother, to whose defense Navarro purportedly came when he stabbed Haltom and Eodice, testified that he did not remember any physical altercation with Matthew Haltom. (D.E. 12-14 at 82:20–24.)

As to Eodice, little eyewitness testimony explained where he was during the fight, much less that he attacked Salazar in concert with others. Indeed, Mackenzie Haltom testified that she saw Eodice being beaten in the fetal position on the ground. (D.E. 12-3 at 72:6–17.) Joel Arnold testified that he did not see Eodice in any fight before seeing Eodice on the ground. (D.E. 12-11 at 120:8–20.) Eodice testified that he "never really fought anybody except for after [he] heard that Matt [Haltom] had been stabbed." (D.E. 12-12 at 77:5–16.)

The court's independent review of the full trial transcript reveals that there was extensive evidence of general fighting, but little evidence to identify who was doing what to whom. Thus, defense counsel was legitimately concerned that, having not put her client on the stand, she was fortunate to get the self-defense

instructions. She may have seen giving up the multiple assailants instruction as an advantageous trade-off.

Particularly under the deferential standards of review imposed by *Strickland* and AEDPA, the court finds that this decision "[fell] within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. Nothing in this record suggests the state habeas ruling "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Mejia*, 906 F.3d at 319. Navarro has not satisfied the deficiency prong of the *Strickland* test, and he is not entitled to relief on this claim. *See id.*

B. Prejudice

Even if Navarro had shown that the state court unreasonably found counsel was not defective, Navarro's *Strickland* claim must still be denied because he has not shown prejudice. *Strickland*, 466 U.S. at 694.

Navarro asserts that his lawyers' ineffective assistance prejudiced him in two ways. First, "[a] multiple assailants instruction would have dramatically expanded the evidence that the jury could consider in deciding Navarro's defenses." (D.E. 37 at 19–20.) Second, "[trial c]ounsel's errors additionally precluded Navarro from obtaining a meaningful review on appeal." (D.E. 37 at 24.) These two theories of prejudice collapse into the same analysis.

Under *Strickland*, prejudice is "a reasonable probability that, but for counsel's professional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. It is not enough to show that errors had "some conceivable effect" on the outcome; rather, counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 693. "The likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011). A court assessing prejudice "must consider the totality of the evidence before the judge or jury," because "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Strickland*, 466 U.S. at 696.

If Navarro's trial counsel had objected on the record, the state appellate court would have considered whether the trial court's error resulted in "some harm," which means asking "whether the defendant suffered some actual, rather than merely theoretical, harm from the error." *Dugar v. State*, 464 S.W.3d 811 (Tex. App.—Hou. [14th Dist.] 2015). Thus, this court's analysis of prejudice under *Strickland* resolves both of Navarro's theories of prejudice. *See Ricalday v. Procunier*, 736 F.2d 203, 208 (5th Cir. 1984) ("Because the error at the appellate stage stemmed from the error at trial, if there was no prejudice from the trial error, there was also no prejudice from the appellate error.").

With no reasoned state-court decision on the merits, this court "must determine what arguments or theories . . . could have supported the state court's decision" and "whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with" Supreme Court precedent. *Sexton*, 138 S. Ct. at 2558. This court concludes that the state habeas court did not unreasonably apply *Strickland* in implicitly finding no prejudice resulted from Navarro's defense counsel's alleged deficiency.

After reviewing the entire trial record, the court determines that the state habeas court reasonably could have found that the multiple assailants instruction would have had no substantial likelihood of changing the jury's verdict, and could have supported that decision with the following legal and factual analysis. *See Sexton*, 138 S. Ct. at 2558.

*First*, the state court reasonably could have found there was no likelihood that the jury would have altered its verdict with the addition of the multiple assailants instruction, because the evidence showed Navarro's use of *deadly* force to protect himself or a third person was unreasonable and unjustified.

Several witnesses, including at least one member of the group that arrived with Navarro, testified that they did not see Haltom's invited guests using any weapons whatsoever. (D.E. 12-3 at 73:17–74:2 (Mackenzie Haltom); D.E. 12-5 at 44:17–21 (Sarah Strelecki); D.E. 12-6 at 125:18–126:5, 130:6–13, 131:6–13 (Jeremy Cano); D.E. 12-8 at 30:10–22 (Eric Hernandez); D.E. 12-12 at 103:22–105:3 (Joseph Eodice).) Several witnesses testified they never thought any deadly force would be necessary to protect themselves during the fight. (D.E. 12-6 at 17:20–18:5 (Rodolpho Diaz never felt anyone's life was in danger); D.E. 12-12 at 103:22–105:4 (Joseph Eodice); D.E. 12-12 at 46:16–18 (Joel Arnold).) While

11

some witnesses testified that Matthew Haltom held a golf club, no witness testified that he ever struck or threatened to strike anyone with it, and some witnesses testified they did not witness Haltom wielding the golf club as a weapon or in any threatening manner. (D.E. 12-4 at 96:1–97:1, 12-5 at 17:20–22 (Mallory Tharpe); D.E. 12-11 at 117:12–118:22, 12-12 at 38:8–13 (Joel Arnold).)

A detective in the Criminal Investigation Unit of the Fort Bend County Sheriff's Department testified that he requested photographs of Navarro be taken (D.E. 12-11 at 74:22–25) in part to document any injuries that may help "examine whether or not there was justification to what occurred in terms of the knife" and "determine whether or not there's any exculpatory information in terms of the defendant." (D.E. 12-11 at 79:10–25.) He testified that Navarro's documented injuries did not lead him to change his conclusions that Navarro was culpable in the fight. (D.E. 12-11 at 79:10–25.)

The multiple assailants instruction was unlikely to change the verdict because, even if the jury found that a group of Haltom's invited guests did gang up, or "dogpile," on Salazar, the group's use of non-deadly force did not justify Navarro's use of a knife. Giovanni Lopez testified that he felt that Salazar's life was in danger at a certain point (D.E. 12-7 at 129:21–23), but he also testified on direct examination that when he intervened on Salazar's behalf, he did not feel he needed a weapon and did not see anyone using a weapon. (D.E. 12-7 at 106:20–107:2, 132:6–133:1.) He did not call an ambulance or the police to help Salazar even after he left the scene. (D.E. 12-7 at 136:24–137:2.) The overwhelming weight of the evidence shows that neither Haltom nor anyone in his group was using deadly force. Multiple witnesses testified that they did not perceive or fear the use of deadly force.

Moreover, evidence showed that any "dogpile" or joint attack on Salazar occurred *after* the group discovered that Haltom had been fatally injured. Given that evidence, a multiple assailants instruction was unlikely to change the jury's findings regarding Navarro's unreasonable use of force.

John Acord testified that he beat Salazar *after* learning Matthew Haltom had been stabbed (D.E. 12-8 at 156:9–160:3) and that he believed he caused certain injuries documented in photos of Salazar's face only *after* he learned Matthew Haltom had been stabbed (D.E. 12-8 at 163:8–10). Morris Arnold testified that he had been fighting with Salazar briefly and that Salazar was not in bad condition when Arnold abandoned the fight to attend to Matthew Haltom, who had called for

attention because he had been stabbed. (D.E. 12-8 at 113:13–114:17.) Joe Eodice testified that he "heard [Acord] say, 'You think you can just stab my friend and get away with it?'" before he started punching Salazar with Acord. (D.E. 12-12 at 81:22–83:13, 113:5–13.)

Considering the foregoing evidence and the scant evidence that any deadly force was used against Salazar or Navarro, it would not have been unreasonable for the state court to conclude that Navarro's use of force was unjustified. As instructed, the jury likely would have found that "under the circumstances as [Navarro] reasonably believed them to be," Navarro would *not* "have been justified in using deadly force to protect himself against the unlawful force or unlawful deadly force he reasonably believed was threatening Guadalupe Salazar," and that Navarro did *not* "reasonably believe[] that his intervention was immediately necessary to protect" Salazar. (Jury instruction on self-defense, D.E. 10-9 at 97.) In accordance with the jury instructions—even with an added multiple assailants instruction—it would not have been unreasonable for the state court to conclude that the jury would still have found Navarro guilty.

Navarro argues that "the jury easily could have found Navarro not guilty based solely on the evidence of Acord's actions in pummeling Salazar, and in telling Taylor Milligan that he was going to 'finish off this fat F-ing Mexican,'" or "that [Haltom and his friends] significantly outnumbered and outsized Navarro's group" and "were wielding broken beer bottles and [a] golf club." (D.E. 37 at 25.) It is not enough for Navarro to state that a jury could have conceivably credited some witnesses' testimony over that of others to arrive at a different verdict. "*Strickland* demands that the chance of a different outcome be 'substantial, not just conceivable.'" *Mejia*, 906 F.3d at 321. Navarro has not shown a "substantial" likelihood of a different outcome, much less that the state habeas court's decision was "not merely wrong, but objectively unreasonable." *Mejia*, 906 F.3d at 321.

*Second*, the state court reasonably could have found that, even with the multiple assailants instruction, the jury would still have found that Navarro's use of deadly force was unjustified, because the evidence showed that Guadalupe Salazar provoked Haltom and his invited guests to fight. The court instructed the jury that "as a qualification of the law on defense of a third person," the "use of force by a defendant against another is not justified if the defendant knows that the person

whom he is seeking to protect provoked the other's use or attempted us of unlawful force []." (D.E. 10-9 at 97–98.)

Witnesses testified that Matthew Haltom was polite or non-aggressive when he requested that Salazar, Navarro, and their party leave Haltom's property. (D.E. 12-5 at 39:16–40:8 (Sarah Strelecki); D.E. 12-6 at 119:17–19 (Jeremy Cano).) Several witnesses, including Salazar himself, also testified that, in contrast, Salazar "turn[ed] around yelling back at [Haltom's] group" (D.E. 12-4 at 89:20–90:4 (Mallory Tharpe)); was "[y]elling vulgar things, saying this is gay, we'll go somewhere else then . . . screaming and acting stupid" (D.E. 12-5 at 41:1–25 (Sarah Strelecki)); and cussed at Haltom's group after being asked to leave (D.E. 12-6 at 120:12–121:18 (Jeremy Cano)). Even Salazar himself testified that he cursed at Haltom's group, and that "[he] ha[d] [his] blames." (D.E. 12-14 at 21:1–8.)

Others testified that Salazar was taunting, acting hostile, and "trying to incite [Haltom's invited guests] to make this a physical thing." (D.E. 12-8 at 101:15–17 (Morris Arnold); D.E. 12-8 at 147:13–18, 148:1–15 (John Acord); D.E. 12-5 at 18:11–21 (Mallory Tharpe).) Joel Arnold testified that Salazar pointed at a number of Haltom's invited guests individually while repeatedly saying, "I'll fight *you*" and moving around in an "excited" fashion. (D.E. 12-11 at 114:6–116:22.) Sarah Strelecki testified that Salazar was the first to throw a punch. (D.E. 12-5 at 46:22–47:5.)

Given the evidence that Salazar provoked the melee, the state habeas court reasonably could have found it unlikely that a jury would have acquitted Navarro even with a multiple assailants instruction. The court instructed the jury that self-defense was not available if the actor, *or* the third party to whose defense the actor came, provoked the use of force. (D.E. 10-9 at 97–98.) Navarro argues that the question whether Salazar provoked the fight was a "fact dispute that *could* have gone either way at trial." (D.E. 37 at 28 (emphasis added).) Again, this is not enough to entitle Navarro to relief. The court's independent review of the trial record does not reveal a "substantial" likelihood of a different outcome. *Mejia*, 906 F.3d at 321.

*Third*, even with a multiple assailants instruction, the state court reasonably could have found that the jury found it improbable that Matthew Haltom was acting in "complicity" with others in attacking Salazar or Navarro, which is necessary to support self-defense based on a multiple assailants theory.

Several witnesses from among the invited guests and the uninvited parties testified that the melee consisted of a series of multiple, smaller fights, rather than a single coordinated effort by either group. Mackenzie Haltom testified that she saw "different people fighting on different sides of me" and that it appeared to be "multiple fights." (D.E. 12-3 at 72:1–8, 12-4 at 16:13–19.) Morris Arnold and Joel Arnold agreed that it was a "free for all." (D.E. 12-8 at 123:20–24, 12-12 at 35:22–25, respectively.) Joseph Eodice testified that there was not really one-on-one fighting—that it was "too crazy for any of that." (D.E. 12-12 at 77:5–11.)

Among the uninvited parties, Rodolpho Diaz testified that it was "[b]oth" "one big group fighting" and "people off individually sort of one on one fighting" (D.E. 12-5 at 137:2–13), and Jeremy Cano testified that it was "kind of sort of both" "one big brawl" and "separate little individual fights," because "like everyone was just basically running around and like fighting." (D.E. 12-6 at 131:6–11.)

There was virtually no evidence that Matthew Haltom was acting in concert with anyone in any of those small fights, let alone with a fight specifically ganging up on Guadalupe Salazar. As Navarro highlights, "[t]here was very little evidence regarding Haltom's participation in the brawl" at all. (D.E. 37 at 24 (Navarro's response to Davis's motion for summary judgment); *see also* D.E. 12-4 at 29:17–19; D.E. 12-4 at 94:24–95:1.) Even Salazar testified that he did not "remember having a physical encounter with [Haltom]." (D.E. 12-14 at 82:20–24.)

On the other hand, at least one witness, John Acord, testified that he saw Matthew Haltom surrounded by a group of three uninvited individuals, which the jury could have credited in finding that he was not part of a coordinated attack on any individual giving rise to a need for self-defense. (D.E. 12-8 at 153:20–155:23.) The state court reasonably could have found this evidence to preclude a multiple assailants instruction from having any substantial likelihood of changing the jury's verdict on the murder charge.

Similarly, the state court reasonably could have found the jury's verdict would have been unchanged by the multiple assailants instruction considering the little or non-existent evidence that Eodice was acting in concert with any group ganging up on Salazar or Navarro. There was little evidence of Eodice's actions during the melee. (*See supra*, discussing D.E. 12-3 at 72:6–17; D.E. 12-11 at 120:8–20; D.E. 12-12 at 77:5–16 (testimony concerning Eodice's actions in any fight).) In

fact, Mackenzie Haltom testified that Eodice was being beaten by two people while in the ditch in the fetal position. (D.E. 12-3 at 72:1–17.)

Given the lack of evidence that either Haltom or Eodice acted in concert with anyone, even with the multiple assailants instruction the jury likely would have considered each of their actions alone—as it did—to determine that Navarro was not justified in using deadly force against either of them. Thus, the state habeas court reasonably could have concluded that the jury's verdict would have been unaffected by a multiple assailants instruction.

Navarro contends that the jury could have credited different witness testimony as proving who started the fight, what weapons were present, and whether Acord and Haltom were acting in complicity. He argues that the jury was prevented from considering certain "fact disputes" that "could have gone either way at trial." (D.E. 37 at 27–28.) "Anything is possible. But *Strickland* demands that the chance of a different outcome be 'substantial, not just conceivable,' and on top of that AEDPA demands that the state court's ruling on prejudice be, not merely wrong, but 'objectively unreasonable.'" *Mejia*, 906 F.3d at 321. This court finds that the state habeas court's prejudice ruling does not rise to that level. *See id.*

4. Navarro's Cruel and Unusual Punishment Claim

In Navarro's second claim, he asserts that he was denied effective assistance of counsel because his trial counsel failed to object to his 99-year sentence as cruel and unusual punishment in violation of the Eighth Amendment. In his response to Davis's Motion for Summary Judgment, Navarro states he "no longer is pursuing this ground." (D.E. 37 at 2.) This court nonetheless finds that this ground is meritless.

The Supreme Court held, in *Miller v. Alabama*, 132 S.Ct. 2455 (2012), "that a juvenile convicted of a homicide offense could not be sentenced to life in prison without parole absent consideration of the juvenile's special circumstances in light of the principles and purposes of juvenile sentencing." *Montgomery v. Louisiana*, 136 S.Ct. 718, 725 (2016). *Miller* and *Montgomery* concern a sentence of life without parole imposed on a juvenile. Those cases do not apply to Navarro. *See Bergara v. Davis*, No. 3:13-CV-273, 2016 WL 8727161, at *3 (S.D. Tex. July 15, 2016) (Hanks, J.) (reasoning that *Miller* would not apply to a juvenile defendant whose sentence included possibility of parole). There is no Supreme Court case holding

that sentencing a juvenile to 99 years in prison with the possibility of parole violates the Constitution. The state court's denial of this claim was not an unreasonable application of Supreme Court precedent.

5. Conclusion

The court recommends that Davis's motion be granted and Navarro's petition be denied with prejudice. Any remaining motions are terminated as moot. Navarro has not met his threshold burden of demonstrating that the state habeas court's denial of these claims constituted an unreasonable application of federal law or an unreasonable determination of the facts in light of the evidence. Similarly, Navarro has not made a substantial showing that he was denied a constitutional right or that it is debatable whether this court is correct in its ruling. Therefore, this court recommends that a certificate of appealability not be issued. *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

The parties have 14 days from service of this memorandum and recommendation to file written objections. Failure to timely file objections will preclude appellate review of factual findings or legal conclusions, except for plain error. *See* Rule 8(b) of the Rules Governing Section 2254 Cases; 28 U.S.C. § 636(b)(1)(c); Fed. R. Civ. P. 72.

Signed at Houston, Texas, on January 3, 2019.

_____
Peter Bray
United States Magistrate Judge